UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

HAMADOU SECK,

                                Plaintiff,

          -against-

THE CITY OF NEW YORK, SERGEANT ROBERT
CASTRO, DETECTIVE RAUDO MELIAN, DETECTIVE
RONNIE WILKERSON, and DETECTIVE MARISSA
CABO,

                                Defendants.

------------------------------------------------------------------x

FIRST AMENDED COMPLAINT

13 Civ. 7509 (RWS)

JURY TRIAL DEMANDED

## NATURE OF THE ACTION

1. This is an action to recover money damages arising out of the violation of Plaintiff's rights under the Constitution of the United States.

## JURISDICTION AND VENUE

2. This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States.

3. The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343, and 1367(a).

4. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 (b) and (c).

## JURY DEMAND

5. Plaintiff demands a trial by jury in this action.

## PARTIES

6. Plaintiff Hamadou Seck ("Plaintiff" or "Mr. Seck") is a resident of the County of New York, City of New York.

7. Defendant The City of New York is a municipal organization organized under the laws of the State of New York.

8. Defendant The City of New York operates the New York City Police Department ("NYPD"), a department or agency of Defendant The City of New York.

9. The NYPD is responsible for the appointment, training, supervision, promotion, and discipline of police officers and supervisory police officers, including the individually named defendants herein.

10. At all times relevant herein, Defendant Sergeant Robert Castro ("Castro") was a supervisor, officer, employee, and agent of Defendant The City of New York.

11. At all times relevant herein, Defendant Castro was acting within the scope of his employment with Defendant The City of New York.

12. At all times relevant herein, Defendant Castro was acting under color of state law.

13. Defendant Castro is sued in his individual and official capacities.

14. At all times relevant herein, Defendant Detective Raudo Melian ("Melian") was a supervisor, officer, employee, and agent of Defendant The City of New York.

15. At all times relevant herein, Defendant Melian was acting within the scope of his employment with Defendant The City of New York.

16. At all times relevant herein, Defendant Melian was acting under color of state law.

17. Defendant Melian is sued in his individual and official capacities.

18. At all times relevant herein, Defendant Detective Ronnie Wilkerson ("Wilkerson") was a supervisor, officer, employee, and agent of Defendant The City of New York.

19. At all times relevant herein, Defendant Wilkerson was acting within the scope of his employment with Defendant The City of New York.

20. At all times relevant herein, Defendant Wilkerson was acting under color of state law.

21. Defendant Wilkerson is sued in his individual and official capacities.

22. At all times relevant herein, Defendant Detective Marissa Cabo ("Cabo") was a supervisor, officer, employee, and agent of Defendant The City of New York.

23. At all times relevant herein, Defendant Cabo was acting within the scope of his employment with Defendant The City of New York.

24. At all times relevant herein, Defendant Cabo was acting under color of state law.

25. Defendant Cabo is sued in his individual and official capacities.

## STATEMENT OF FACTS

26. On the morning of November 10, 2010, Mr. Seck was lawfully present at 2321 Adam Clayton Powell, Jr. Blvd., Apt. 5O, New York, New York ("Subject Location").

27. Mr. Seck heard a knock on the door.

28. Mr. Seck went to the door and asked who was there.

29. A person outside told him that it was the police.

30. Mr. Seck asked who the police were looking for.

31. The officer responded with the name of a person that Mr. Seck did not recognized and does not remember at this time.

32. Mr. Seck informed the officer that the person did not live there and that he did not recognized the person's name.

33. The officer ordered Mr. Seck to open the door to his apartment.

34. Mr. Seck complied and opened the door slightly.

35. Defendant Castro showed Mr. Seck a picture of a male and asked if he knew him.

36. Mr. Seck informed Defendant Castro that he did not recognize the person in the picture.

37. Defendant Castro mocked Mr. Seck and said in sum and substance "You don't know him? Are you sure he isn't hiding in your apartment?"

38. Mr. Seck said that he did not know the person and that the person was not hiding in his apartment.

39. Defendant Castro ordered Mr. Seck to exit his apartment.

40. Mr. Seck told Defendant Castro "No."

41. Defendant Castro grabbed Mr. Seck and violently pulled him out of his apartment.

42. Defendant Castro ordered either Defendant Wilkerson and/or Defendant Melian to search Mr. Seck's apartment.

43. Defendant Wilkerson and/or Defendant Melian entered Mr. Seck's apartment and began to search it.

44. Mr. Seck objected to the search of his apartment and to being held by the individual defendants against his will.

## FIRST CAUSE OF ACTION
*42 U.S.C. § 1983*

52. Mr. Seck repeats and realleges each and every allegation as if fully set forth herein.

53. Defendants, by their conduct toward Mr. Seck as alleged herein, violated Mr. Seck's rights guaranteed by 42 U.S.C. § 1983, the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States.

54. As a direct and proximate result of this unlawful conduct, Mr. Seck sustained the damages herein alleged.

## SECOND CAUSE OF ACTION
*Unlawful Stop and Search*

55. Mr. Seck repeats and realleges each and every allegation as if fully set forth herein.

56. Defendants violated the Fourth and Fourteenth Amendments because they stopped and searched Mr. Seck without reasonable suspicion.

57. As a direct and proximate result of this unlawful conduct, Mr. Seck sustained the damages herein alleged.

## THIRD CAUSE OF ACTION
*False Arrest*

58. Mr. Seck repeats and realleges each and every allegation as if fully set forth herein.

59. The individual defendants violated the Fourth and Fourteenth Amendments because they arrested Mr. Seck without probable cause.

60.     As a direct and proximate result of this unlawful conduct, Mr. Seck sustained the damages herein alleged.

## FOURTH CAUSE OF ACTION
### *Excessive Force*

61.     Mr. Seck repeats and realleges each and every allegation as if fully set forth herein.

62.     Defendant Castro violated the Fourth and Fourteenth Amendments because they used unreasonable force on Mr. Seck.

63.     As a direct and proximate result of this unlawful conduct, Mr. Seck sustained the damages herein alleged.

## FIFTH CAUSE OF ACTION
### *Failure to Intervene*

64.     Mr. Seck repeats and realleges each and every allegation as if fully set forth herein.

65.     Those defendants that were present but did not actively participate in the aforementioned unlawful conduct observed such conduct; had an opportunity to prevent such conduct; had a duty to intervene and prevent such conduct; and failed to intervene.

66.     Accordingly, the defendants who failed to intervene violated the Fourth, Fifth, and Fourteenth Amendments of the Constitution of the United States.

67.     As a direct and proximate result of this unlawful conduct, Mr. Seck sustained the damages herein alleged.

## SIXTH CAUSE OF ACTION
### *Equal Protection Clause under 42 U.S.C. § 1983*

68. Mr. Seck repeats and realleges each and every allegation as if fully set forth herein.

69. The Defendants' conduct was tantamount to discrimination against Mr. Seck based on his ethnicity. This disparate treatment caused Mr. Seck to suffer serious injuries.

70. The NYPD discriminatory program is pervasive and evident throughout many of its practices, including those used to stop, question, search, and arrest Mr. Seck.

71. The NYPD has maintained illegal stop and question practices, as part of a systematic discriminatory program aimed towards minorities. The searches occur nearly every day without the requisite level of suspicion, and are so customary as to constitute official municipal policy.

72. One such program is the Clean Halls Buildings program, which initially created to combat illegal activity in apartment buildings. Many buildings are enrolled and remain in the program without regard to whether there is sustained or substantial crime. Thus, residents and their unsuspecting guests are left subject to the unscrupulous stop, question, search, citation, and arrest practices of local NYPD officers.

73. The impact on Blacks and Latinos as compared to Whites is disparaging and significant. From 2006 to 2010, approximately 94.4% of those stopped and questioned for trespassing were Black and Latino, although they only accounted for 52% of the New York City population. Blacks and Latinos were 6 times more likely to be stopped by police than Whites, Asians, and Native Americans combined.

74. The NYPD has also maintained illegal stop and frisk policies, as part of a systematic discriminatory program aimed towards minorities.

75. The New York State Attorney General's 1999 inquiry into the NYPD's stop and frisk program found that between the 175,000 "UF-250" stop and frisk forms filed by officers indicated consistent and significant racial skewing.

76. According to the report, Blacks comprised 25.6% of the City's population, yet 50.6% of all persons stopped were Black. Hispanics comprised 23.7% of the City's population yet, 33.0% of all stops were of Hispanics. By contrast, Whites made up 43.4% of the City's population, but accounted for only 12.9% of all stops. The disparities were further pronounced in precincts where the majority of the population was White. Where Blacks and Hispanics each represent less than 10% of the population, Blacks and Hispanics accounted for more than 50% of stops during any given period. The New York State Attorney General's finding was that 8 out of 9 searches did not uncover contraband.

77. Under the NYPD's policy, if a person is stopped and questioned without official use of force (or with consent) and gives his or her name, documentation is not required. Consequently, NYPD officers frequently do not to file the proper UF-250 form to record stop and frisk searches.

78. Many experts believe the numbers available from NYPD offices do not accurately reflect the discrimination of the NYPD's stop and frisk program. In one independent street interview conducted with 100 Black and Hispanic males between the ages of 14 and 35, 81 participants reported having been stopped, patted down and questioned, without being arrested.

79. The NYPD arrests more Blacks, Hispanics, and other minorities as compared to Whites in furtherance of its systematic discriminatory program.

80. The NYPD frequently uses marijuana arrest cases to bolster both its productivity and arrest reports. Marijuana possession is an infraction payable by fine in New York City, yet from 1997 to 2006, 52% Blacks, 31% Hispanics were arrested for possession of marijuana, as compared to 15% of Whites.

81. Despite the overwhelming evidence from U.S. government surveys that have consistently shown young Whites between the ages of 18 and 25 using marijuana at higher rates than either young Hispanics and Blacks, in 2006, the marijuana arrest rate of Blacks was five times that of Whites. The arrest rate of Hispanics in 2006 was nearly three times that of Whites.

82. Arrest records consistently show that where minorities represent a small portion of the population, they also represent the majority of arrestees (with the exception of Staten Island). In Staten Island, Blacks were about 10% of the population, but were 37% of marijuana arrestees. In Manhattan, Blacks were about 17% of the population, but accounted for 43% of marijuana arrestees. In Queens, Blacks were about 20% of the population, but accounted for 57% of marijuana arrestees. In Brooklyn, Blacks were about 36% of the population, but were an overwhelming 65% of marijuana arrestees. Finally, in the Bronx, Blacks were 36% of the population, but accounted for 48% of marijuana arrestees. The White population and the White percentage of marijuana arrestees in each borough were equally skewed, but in the opposite direction.

83. Trespassing and marijuana arrests are the most effective means available for obtaining fingerprints, photographs, and DNA samples (since 2006) from people never before

entered in the criminal justice databases. Where those trespassing and marijuana stops result in the issuance of a fine rather than arrest, the outcome is often still detrimental. Often times, young persons in the housing projects (such as those enrolled in the Clean Halls Buildings program) or other poor neighborhoods do not have the means to pay the fines, and a criminal courts will issue a warrant for their arrest. Many times, the subsequent occasion on which that person is stopped, questioned, frisked, or searched by the NYPD, the outstanding warrant will ultimately serve as a basis for arrest.

84. In fact, Defendant The City of New York is estopped from asserting that such discrimination and tactics do not occur. In Floyd, et al. v. The City of New York, 08 Civ. 1034 (SAS) (S.D.N.Y. Aug. 12, 2013), the Court found that "[t]he NYPD's practice of making stops that lack individualized suspicion has been so pervasive and persistent as to become not only part of the NYPD's standard operating procedure, but a fact of daily life in some New York City neighborhoods." See Floyd, Docket Entry No. 373 at p. 180.

85. The Court goes on to find that Defendant The City of New York, in fact, has a policy of indirect racial profiling, and that senior officials of Defendant The City of New York have been deliberately indifferent to the tactics used by NYPD's members. See id. at p. 181.

86. As a result of the foregoing, Mr. Seck was deprived of rights under the Equal Protection Clause of the Constitution of the United States, and are thereby entitled to damages.

### SEVENTH CAUSE OF ACTION
*Monell*

87. Mr. Seck repeats and realleges each and every allegation as if fully set forth herein.

88. This is not an isolated incident. Defendant The City of New York, through its policies, customs, and practices, directly caused the constitutional violations suffered by Mr. Seck.

89. Defendant The City of New York, through the NYPD, has had, and still has, hiring practices that it knows will lead to the hiring of police officers lacking the intellectual capacity and moral fortitude to discharge their duties in accordance with the Constitution of the United States and is indifferent to the consequences.

90. Defendant The City of New York has stop and frisk tactics and procedures that encourages unlawful stops, unlawful searches, false arrests, the fabrication of evidence, and perjury.

91. As noted, supra, Defendant The City of New York is estopped from asserting that these stop and frisk tactics do not exist and that they are unlawful.

92. Defendant The City of New York, through the NYPD, has a *de facto* quota policy that encourages unlawful stops, unlawful searches, false arrests, the fabrication of evidence, and perjury.

93. This quota policy requires that police officers, including the individual defendants named herein, make a certain number of arrests and/or write a certain number of summonses and desk appearance tickets within an allocated time period.

94. Officers that meet the required number of arrests, summonses, and desk appearance tickets are classified as active officers.

95. Officers that do not meet the required number of arrests, summonses, and desk appearance tickets are classified as inactive officers.

96. Active officers are given promotion opportunities that are not afforded to inactive officers.

97. Active officers are given overtime opportunities, such as security at parades, etc., that are not afforded to inactive officers.

98. The quota policy does not differentiate between arrests, summonses, and desk appearance that are supported by probable cause and ones that are not.

99. Defendant The City of New York, through the NYPD, does nothing to ensure that officers, in trying to fulfill this quota policy, are making arrests and issuing summonses and desk appearance tickets lawfully. There are no post-arrest investigations that are performed, and no policies in place that would prevent abuse of this policy, such as is demonstrated in the instant case.

100. Defendant The City of New York, through the NYPD, does nothing to determine the outcome of the charges levied against arrestees in order to proper counsel officers as to the lawfulness of their arrests/issuance of summonses and desk appearance tickets.

101. The failure of Defendant The City of New York to, *inter alia*, take these steps encourages, *inter alia*, unlawful stops, unlawful searches, false arrests, the fabrication of evidence, and perjury, in that the quota policy provides, *inter alia*, career and monetary incentives to officers, including the individual defendants herein.

102. Defendant The City of New York is estopped from asserting that a quota/productivity policy does not exist and that this policy motivates police officers to violate the rights of individuals. See Bryant v. The City of New York, 022011/2007 (Kings Cnty. Sup.

110. Defendant The City of New York, at all relevant times, was aware that the individual defendants are unfit officers who have previously committed the acts alleged herein and/or have a propensity for unconstitutional conduct.

111. These policies, practices, and customs were the moving force behind Mr. Seck's injuries.

## PRAYER FOR RELIEF

**WHEREFORE**, Mr. Seck respectfully requests judgment against Defendants as follows:

(a) Compensatory damages against all defendants, jointly and severally;

(b) Punitive damages against the individual defendants, jointly and severally;

(c) Reasonable attorney's fees and costs pursuant to 28 U.S.C. § 1988; and

(d) Such other and further relief as this Court deems just and proper.

Dated: New York, New York
       November 4, 2013

Gregory P. Mouton, Jr., Esq.
The Law Office of Gregory P. Mouton, Jr.
Attorney for Plaintiff
305 Broadway, 14th Floor
New York, NY 10007
Phone & Fax: (646) 706-7481
greg@moutonlawnyc.com